Ross W. Wood and Richard D. Wood *vs.* John A. Warner, Bernard Vetterlien, and Charles F. Tay.

Complainants and defendants, being joint owners of an island in the Caribbean sea, said to contain large deposits of guano, entered into an agreement that complainants should conduct the business of collecting and selling the guano for the mutual benefit of all concerned, and that the profits and losses of the business should be divided among all the parties according to their respective interests, and that complainants should have a lien on the island and all the personal property used in their business for any advances made by them. The business generally proving unprofitable, the complainants filed their bill against the defendants (who are citizens of this state, and appeared regularly to the suit,) praying an account and a decree against the defendants for their proportion of the losses, and for a sale of the island, its contents, and the personal property connected therewith—

*Held,* that it is no objection to the court's taking an account, and making a decree in the cause, that the property is out of the jurisdiction of the court, so that the decree cannot be enforced *in rem.*

The strict primary decree of a court of equity is *in personam,* and not *in rem,* and the authority of this court to deal with contracts in relation to land not within the jurisdiction of the court is fully established.

The contract between the parties and the circumstances of the case *held* to be such as to entitle the complainants to close their operations, and seek an account and settlement in this court.

*Williamson*, for complainants.

*Zabriskie*, for defendants.

THE CHANCELLOR. The bill of complaint charges that, in the year 1857, Ross W. Wood, one of the complainants, and Alexander H. Grant, copartners in trade in the city of New York, under the name and style of Wood & Grant, became interested in the island of Sombrero, an uninhabited island in the Caribbean sea, said to contain large and valuable deposits of guano; that John E. Gowan & Co., of Boston, claiming to have taken possession, and to be the owners of said island, and. to have taken the necessary steps with the state department of the government of the United States to insure the protection of said island to the said John E. Gowan & Co., and Andrew C. Elliott, and one George R. Field, also claiming to have some right or title in said island, it was agreed between the said Wood & Grant and the said John E. Gowan & Co., Field, and Elliott, that Gowan & Co. should sell to Wood & Grant one half interest of the whole of said island, upon the following conditions, *viz.* that Wood & Grant should execute their notes for $30,000, which notes should become the property of Gowan & Co., Field, and Elliott, in the following proportions, *viz.* Gowan & Co. five-eighths, Elliott two-eighths, and Field one-eighth; that *Wood & Grant should raise a working capital of* $20,000, to be used in the business of collecting and shipping guano from said island; that upon the execution of said notes for $30,000, and agreeing to raise the said working capital of $20,000, Wood & Grant should own and be possessed of one half of the island and its contents, and all benefits to be derived therefrom; and that Wood & Grant should have the sole control of the working and management of the whole island, for the benefit of all the parties interested, and that the net profits of work-

ing the island, or the *losses arising from the sale of either the island or its contents,* should be divided as follows, *viz.* one half to Wood & Grant, one quarter to John E. Gowan & Company, and the remaining quarter to Field and Elliott.    It was further agreed between the parties, *that Wood & Grant should have the sole right to sell, lease, convert into a joint stock company, or work the said island* for the mutual benefit of the parties interested.    Wood & Grant, having paid the consideration agreed upon, on the fifth of August, 1857, received a deed for one half of the island.    They also advanced the working capital of $20,000, and carried on the business of digging and shipping guano, for the benefit of the concern, until the twelfth of October, 1859, when their interest passed into the hands of the complainants, by whom the business continued to be carried on with the consent of the proprietors. By subsequent transfers, the complainants became the owners of three-fourths of the property invested in the enterprise, and Warner, and the other defendants holding under him, of the other fourth.    The bill charges that, from the first of February, 1860, till the twentieth of July, 1861, the concern lost $55,394, and that at the latter date Warner was indebted to the complainants over $20,000; that the complainants are in possession of the island, and of a large amount of personal property connected with the business, upon which, by an agreement with Warner, they have a lien for all moneys advanced by them in carrying on the business.    The prayer of the bill is, that an account may be taken; that the complainants may be paid the sum that may be found due to them; that the defendants may contribute for the advances made and losses sustained; that in default of payment, the right and interest of the defendants in the island, its contents, and the property connected therewith, may be sold to pay the complainants the amount decreed to be due them, and that they may have such other relief as may be agreeable to equity.

There is no question as to the interest of the parties, respectively, in the matter in controversy, and but little as

to the material facts upon which the complainants found their claim for relief. The questions raised by the answer relate mainly to the mode of taking the account, and as no instructions are asked upon that subject, it will be unnecessary to dispose of them.

The only questions submitted for decision at this time relate to the jurisdiction of the court and and the right of the complainants to an account.

Upon the question of jurisdiction I entertain no doubt. The complainants come before the court to obtain a settlement of accounts and a decree for the payment of the balance due. The defendants are all citizens of this state, and their appearance has been duly effected. It may be that the court cannot enforce its own decree *in rem* by making sale of the defendants' title to the island of Sombrero, as prayed for in the bill. I do not understand the complainants' counsel as insisting upon that. But that is no objection against taking an account and making a decree in the cause. The strict primary decree of a court of equity is *in personam*, and not *in rem*. In *Penn* v. *Lord Baltimore,* 1 *Vesey, sen.* 444, the court decreed the specific performance of articles of agreement between the proprietors of Pennsylvania and Maryland relating to the boundaries of the two provinces. In delivering his opinion in that case, Lord Hardwicke said: " As to the court's not enforcing the execution of their judgment, if they could not at all, I agree it would be in vain to make a decree, and that the court cannot enforce their own decree *in rem* in the present case; but that is not an objection against making a decree in the cause; for the strict primary decree in this court, as a court of equity, is *in personam.* Long before this court could issue to put into possession in a ·suit of lands in England, which was first begun and settled in the time of James I, but ever since done by injunction or writ of assistance to the sheriff; but the court cannot, to this day, as to lands in Ireland or the plantations. In Lord King's time, in the case of *Richardson* v. *Hamilton,* attorney general of Pennsylvania, which was a suit of land and a

house in the town of Philadelphia, the court made a decree, though it could not be enforced *in rem.* In the case of Lord Anglesey, of land lying in Ireland, I decreed for distinguishing and settling the parts of the estate, though impossible to enforce that decree *in rem;* but the party being in England, I could enforce it by process of contempt *in personam* and sequestration, which is the proper jurisdiction of the court."

"The proposition," says Mr. Justice Story, "may be laid down in the most general form, that to entitle a court of equity to maintain a bill for the specific performance of a contract respecting land, it is not necessary that the land should be situate within the jurisdiction of the state or county where the suit is brought. It is sufficient that the parties to be affected and bound by the decree are resident within the state or county where the suit is brought; for in all suits in equity the primary decree is *in personam,* and not *in rem.*" 1 *Story's Eq. Jur.,* § 744.

These cases establish the authority of the court to deal with contracts in relation to land not within the jurisdiction of the court.

Whether the court can at all interfere, either with the sale of the land or the disposition of the proceeds of such sale, it is unnecessary now to consider. The power of the court to decree the settlement of the accounts between the parties, and the payment of the balance, if any found due, and to enforce such decree *in personam* cannot be questioned.

It is insisted by Warner, in his answer, that by the terms of the agreement of the twenty-third of May, 1857, all advances by the complainant were to be a lien upon the property, and to be reimbursed out of the business; and that, therefore, he cannot be held responsible for any advances made beyond the value of the property. But it is expressly stipulated, by the agreement, that the *losses,* as well as the net profits arising from the sale either of the island or of its contents, shall be divided between the parties, in proportion to their respective interests in the concern. That consequence would seem necessarily to result from the very nature of the

contract, even if there had been no stipulation to that effect. The parties were in fact partners in the enterprise, and were to share in the profits in proportion to their respective interests in the capital invested. Wood & Grant, whom the complainants represent were, by the terms of the contract, to own one half of the island and its contents, and all benefits to be derived therefrom, and to have the entire control of the working and management of the whole, for the benefit of themselves and all the parties interested. In the absence of any express stipulation that Wood & Grant should bear all losses that might be incurred, or that the work should be carried on at their own expense and hazard, the fair implication would be, that the losses are to be shared by all the parties concerned in proportion to their respective interests. So far as regards a participation in profits and losses, the contract virtually constitutes a partnership as between the parties themselves, although there was no partnership name, and it was expressly stipulated that no one of the parties should have power to bind the others.

But the objection to an account was limited by counsel, upon the argument, to the one ground, that in the present state of the business the complainants are not entitled to an account. The objection is founded on the terms of the agreement of the fifth of June, 1857. By the terms of that agreement, Wood & Grant were to furnish a working capital of $20,000, to be used in carrying on the business of collecting and shipping guano; they were to have the sole control of the working and management of the whole concern for the mutual benefit of all concerned, with the right to sell, lease, convert into a joint stock company, or work for mutual benefit. It is urged that they have neither sold nor leased, and that they were therefore bound to continue to carry on the business for mutual benefit, and that they are not entitled to an account before the close of the business; that a court of equity will not permit them, merely because the business is depressed and temporarily unproductive, to close operations under their contract, to call their associates in the

enterprise to an account, and strip them of their interest in the concern.

If this contract constitutes a partnership between the parties, being indefinite in its duration, either party, upon well settled principles, had a right to terminate it at his pleasure. 3 *Kent's Com.* 53; *Gow on Partn.* 269, 275; *Story on Partn.*, § 84.

There is no evidence in the case of a fraudulent purpose on the part of the complainants in closing their operations. The bill distinctly states that the business, for some months before filing the bill, had ceased to be productive, and that very heavy losses were sustained in carrying it on. It assigns, as a leading cause of the unfortunate character of the recent operations, the failure to find a market, owing to the national difficulties, and the impossibility of making sales at the south, where the principal market had previously been found. It is obvious that in such an enterprise emergencies may arise which will not only justify, but require the cessation of the business. Such contingencies must have been within the contemplation of the parties in forming the contract. It is not denied that the complainants furnished the working capital of $20,000 according to their contract, and entered in good faith upon its performance. So far as appears the business was carried on from 1857 until the close of 1859 successfully and to the satisfaction of all concerned. If the business, from causes beyond the control of the complainants, has since proved disastrous, I see no reason why they should not be permitted, either as partners or as agents of the proprietors, to close their operations, and seek an account and settlement in this court.

But whatever obligation might have been imposed upon the complainants by the contract of 1857 to continue the business, it would seem to be discharged by the contract of the thirteenth of January, 1860. By that agreement, made between the owners of the island and William A. Howard, the island, together with all the vessels, boats, horses, implements, railroad and cars, and everything appertaining and

necessary for getting out and delivering the guano on board of the vessels, were delivered to Howard, who agreed, for a stipulated compensation, to get out and ship the guano, as instructed by the proprietors or their authorized agents. This contract was, by its terms, to continue for three years from the first of April, 1860, with liberty to either party, upon a reasonable cause of dissatisfaction, to terminate it. It was in fact terminated by Howard, in July, 1860, before it had been in operation four months. Since that time the property has remained in the possession and under the control of the complainants.

I can see no ground upon which they can be required to carry on the business at a sacrifice of their interests, or prevented from having an account and settlement with those interested in the enterprise.

. There must be a reference to a master to take the account. All further equity is reserved until the coming in of the report.